U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2011 SEP 13  PM 2: 25

CLERK

-----------------------------------------------------------------------x

TIM WAUN; BRIAN BUTTARS,
on behalf of themselves and all others similarly situated,

                 Plaintiffs,

        -against-

DAIRY FARMERS OF AMERICA, INC.; and
KELLER'S CREAMERY, LP

                 Defendants.

-----------------------------------------------------------------------x

Civil Action No. 2:11-CV-219

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

      Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for damages, disgorgement, injunctive relief and costs of suit including reasonable attorneys' fees for injuries to themselves and members of the proposed class they represent. The allegations set forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding the plaintiffs.

INTRODUCTION

      1.    This action arises from defendants' conspiracy to fix, stabilize, raise and maintain the prices of Class I & III Milk and products containing Class I & III Milk including all cheeses (other than cottage cheese) ("Dairy Products") through the manipulation of trading on the Chicago Mercantile Exchange ("CME"). To further their conspiracy, defendants manipulated and raised the prices on the CME Cheese Spot Call Auction ("Cheese Spot") Market and June, July and August 2004 futures contracts on the CME Class III Milk Futures ("Milk Futures") Market. They knew that these prices were used as a basis for the prices of Dairy Products with one defendant's customers, and that increasing these prices would also increase the prices of Dairy Products with those customers. One defendant's primary business is the sale of Dairy

Products. The Cheese Spot market is thinly traded representing about one percent of the nationwide supply of cheese. The Milk Futures market places limits on holdings of speculative positions, which defendants knowingly violated, inflating the prices of Milk Futures contracts. Accordingly, the loss that was suffered from buying the Cheese Spot and Milk Futures contracts on the CME was more than off-set by the profits made from the increase in prices of Dairy Products caused by the engineered spike in Cheese Spot prices and Milk Futures contract prices.

2. This behavior strips the defendants of any immunity under the Capper-Volstead Act. It renders Dairy Farmers of America, Inc.'s ("DFA") – a cooperative of 18,000 dairy farmers – and its members liable as a naked combination among competitors in unreasonable restraint of trade.

3. On December 18, 2008, the Commodity Futures Trading Commission ("CFTC") concluded its investigation of DFA's trading activity and ordered DFA to pay a $12 million fine for its market manipulation of the CME. The order (the "Order") was the result of an agreement between the CFTC and DFA and does not purport to address the entirety of defendants' illegal conduct.

JURISDICTION AND VENUE

4. Plaintiffs' and class members' claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) and the antitrust and unfair trade practice statutes and common law of 24 states and the District of Columbia. This Court has original jurisdiction over the federal claims pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) and 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the Class exceeds $5 million exclusive of interest and costs. In addition, this Court

has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts of the federal claims asserted in this action.

5.     Venue is proper in the District of Vermont pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because defendants transact business and may be found in the District of Vermont.

6.     Defendants' activities were intended to, and did, have a substantial effect on interstate and intrastate commerce.  As a direct, foreseeable and intended result of defendants' scheme, the price of Dairy Products increased in Arizona, Arkansas, California, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin and the District of Columbia.  Plaintiffs and the Class paid these artificially inflated prices for Dairy Products that they purchased at retail establishments in each of the foregoing states.

PARTIES

Plaintiffs

7.     Plaintiff Tim Waun is a citizen of Michigan.  He purchased Dairy Products, including Borden's American Cheese, at retail establishments in Michigan between April 14, 2004 and December 16, 2006.  Plaintiff Waun paid artificially inflated prices in Michigan for these Dairy Products (including Borden's American Cheese) as a result of defendants' scheme.

8.     Plaintiff Brian Buttars is a citizen of New York.  He purchased Dairy Products, including Helluva Goods Sharp Cheddar Cheese, at retail establishments in New York between April 14, 2004 and December 16, 2006.  Plaintiff Buttars paid artificially inflated prices in New York for these Dairy Products (including Helluva Goods Sharp Cheddar Cheese) as a result of defendants' scheme.

3

Defendants

9.     Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business in Kansas City, Missouri.

10.     DFA is a vertically integrated cooperative of 18,000 raw milk producers in 48 states, and owns and operates its own hauling companies, processing plants and distribution centers for milk and cheese throughout the country.  At all relevant times, DFA purchased milk from its members in each and every state in the continental United States.

11.     Defendant Keller's is a limited partnership with its principal place of business in Kansas City, Missouri.

12.     At all relevant times, DFA or Keller's had facilities in, among other places, California, Michigan, Minnesota, New York, Pennsylvania, Tennessee, Utah and Wisconsin.

13.     Neither of the defendants maintains a place of business in Massachusetts.  Neither of the defendants keeps assets in Massachusetts.

14.     National Dairy Holdings, LP ("NDH") is a limited partnership organized and existing under Delaware law with its principal place of business in Dallas, Texas.  NDH is one of the largest dairy processors in the United States.  NDH is the parent company of Borden Dairy, Meadow Gold, Flav-O-Rich and Dairy Fresh.  NDH's direct or indirect subsidiaries own and operate plants that process DFA's raw milk.  Until May 2009, DFA owned an 87.5 percent common equity interest and 92 percent preferred equity interest in NDH.

15.     DFA, NDH (before DFA's sale of its interest) and Keller's and their direct and indirect subsidiaries are hereinafter referred to as the Defendants' Families.

16.     The Defendants' Families manufacture and sell milk, cheese and butter throughout the United States under the brand names or private labels, *inter alia*, Borden, Mid-

America Farms, Hotel Bar, Breakstone's, Plugra, Roberts, Hiland Dairy Foods, Stremick's-Heritage Foods, Wilcox Dairy Farms, HP Hood, Meadow Gold, Flav-O-Rich, Dairy Fresh, Helluva Goods, Maggio, Penn Maid, Dairymens, Chattanooga Dairy, Velda Farms, Coburg Milk, Goldenrod Dairy Foods, Cream O Webber, Stinton Dairy, Happy Farms, Lakeshire, Joseph Farms, Our Family, IGA, Piggly Wiggly, RichFood, Roche Brothers, Cumberland, PriceWise, Market Pantry, Big Y, Food Club, Haggen, Meijer, Schnuck's, Valu Time, Wisconsin Finest, Haolam, Migdal, Millers, Shemesh and Chefs.

17.   At all relevant times, the Defendants' Families manufactured and sold Borden's American Cheese and Helluva Goods Sharp Cheddar Cheese, both of which were purchased by Plaintiffs.

CO-CONSPIRATORS

18.   Various individuals and entities that are presently unknown to plaintiffs participated as co-conspirators with defendants in the wrongful conduct alleged herein and have engaged in conduct and made statements in furtherance of the conspiracy.

19.   The acts charged in this Complaint were done or authorized by defendants' or their co-conspirators' officers including, but not limited to, Gerald Bos (DFA's ex-Chief Financial Officer), Gary Hanman (DFA's ex-President and Chief Executive Officer), John Wilson (DFA's ex-Corporate Vice-President of Marketing and Economic Analysis), Elvin Hollon (DFA's Director of Fluid Marketing and Economic Analyst), Frank Otis (Keller's ex-Chief Executive Officer), Glenn Millar (Keller's ex-Vice President of Procurement Operations), agents, employees or representatives while actively engaged in the management of their business or affairs.

## THE CME AND ITS EFFECT ON MILK AND CHEESE PRICES

**The CME**

20.     The CME is the world's largest futures commodity exchange. To the extent that commodity futures contracts are traded on the CME, the CME must be licensed by the CFTC pursuant to the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).  To receive a license, the CFTC was required to, and did in fact, determine that the CME has adequate rules and policies that, if obeyed, would prevent market manipulation. The CFTC regulates the trading of futures on the CME.

21.     Cash markets on the CME such as the Cheese Spot market are unregulated by any government agency.

22.     The CME is not a member of the DFA, Keller's or any cooperative.  It is not a producer of agricultural products or a cooperative of producers of agricultural products.  It is not engaged in the processing, preparing for market, handling or marketing of agricultural products.

**The CME Cheese Spot Call Auction Market Is a Relevant Market**

23.     The Cheese Spot market conducts trading in cheddar cheese 40-pound blocks and 500-pound barrels during 15-minute weekday sessions.  CME members trade cheddar cheese blocks and barrels by posting bids and offers on a board.  The final transaction price or the final unfilled bid or offer, if different from the last transaction price, during the trading session determines the block and barrel settlement prices for the day.

24.     The Cheese Spot market is the only commodity exchange market for cheddar cheese in the United States.  It brings together participants in the cheese industry that have interests in buying or selling cheese for immediate delivery.

25.     The CME has created a uniquely efficient market for the trading of cheddar cheese for immediate delivery by, among other things, creating standardized contract terms, rules governing trading behavior and a public schedule for trading.   Chapter 53S of the CME Rulebook provides detailed standardized contract terms that include specifications on the quality and color of the cheese; quantities of cheese; settlement procedures for transactions; allowances for deviations from contract terms; the method to calculate freight charges for shipments; packaging; reimbursement for the cost of packaging; rules governing inspection of the cheese; arbitration for disputes and a method to calculate compensation in the event of default.   These rules minimize the transaction costs for traders.

26.     Because no government entity has authority to regulate cash price commodity exchange markets, the CME fills the gap with its own rules and enforcement mechanisms to minimize manipulation of prices on the exchange.   The CME can impose fines of up to $1,000,000 on its members for each violation of its rules.

27.     Because of its unique attributes, traders on the exchange, including participants in the dairy industry, do not have any reasonably available alternatives to the Cheese Spot market to conduct the transactions for which they use that market.

**Manipulation of the CME Cheese Spot Call Auction Market**

28.     At all relevant times, defendants knew that the Cheese Spot market was vulnerable to manipulation as it comprises less than two percent of the annual U.S. supply of cheddar cheese.

29.     Defendants also knew that the Cheese Spot market was vulnerable to manipulation because (1) it is thinly traded; (2) a relatively few number of traders make the

predominant number of transactions; and (3) the pricing structure does not necessarily reflect the actual cost of buying and selling cheese.

      30.    As the U.S. General Account Office ("GAO") explained, "the spot cheese market remains a thin market, which in combination with the presence of a small number of traders that make a majority of trades and the spot cheese market's pricing structure contributes to questions about the potential for price manipulation. A thin market generally has either few transactions; transactions that represent only a small proportion of the total transactions, including those that are priced off that market; or both. ... Little trading occurs on the CME spot cheese market, and the trading that does take place consistently represents a small proportion of the total volume of cheese produced in the United States. ... [T]he volume of cheese traded at CME generally represented less than 2 percent of all cheddar cheese and less than 1 percent of all cheese produced in the United States annually. ... [T]hin markets raise concerns about the potential for manipulation because of the small number of participants and transactions involved in the market and the ease with which prices can be impacted. For example, in thinly traded markets each individual participant's activity tends to be more influential than it would be on a market with more transactions and more participants. As a result, it may be easier for a market participant to move prices in a preferred direction over a short period of time with relatively few completed or unfilled transactions. Further, individual transactions to buy and sell cheese that set the market price may not accurately reflect supply and demand. Further, the CME spot cheese market has a small number of traders who make the majority of trades, another factor that contributes to questions about possible price manipulation. ... The CME spot cheese market's pricing structure, in combination with a thinly traded market and a small number of traders who comprise the majority of trading, contributes to questions about the potential for price manipulation. ...

8

[P]rices at the CME spot cheese market are based on completed transactions and on unfilled higher bids and uncovered lower offers that are posted by market participants.  During a trading session an unfilled bid that is higher than the previous bid or transaction price can result in a higher price.  Similarly, an uncovered offer that is lower than the previous offer or transaction price can result in a lower price. ...  [T]his pricing structure may increase opportunities to ultimately change the price of milk without reference to the actual costs of buying and selling cheese." GAO Report at 9-13.

31.     In the Order, the CFTC found "[b]eginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese.  From May 21 to June 23, 2004, DFA ... purchased and took delivery of a total of 323 loads (approximately 40,000 pounds per load) of cheddar cheese blocks at $1.80 per pound on the CME Cheese Spot Call.  During this period, DFA was the sole purchaser of cheddar cheese blocks on the CME." Order at 2-3.

32.     Defendants continued their market manipulation after June 23, 2004.   For example, DFA made large purchases of CME cheddar cheese blocks in August and September 2004 when it purchased about 100 truckloads of cheese.

33.     DFA cornered the market giving it a 100 percent market share in the Cheese Spot market during the periods of time when it purchased inordinate amounts of cheddar cheese blocks on the CME, including but not limited to May 21 to June 23, 2004.

34.     DFA made these cheese purchases even though it had an excess inventory of cheese that was growing old and required liquidation. DFA's procurement department had advised its traders that DFA had excess cheese and that there was no need for any additional Cheese Spot purchases. Contrary to this advice, DFA continued to purchase on the Cheese Spot

market. Accordingly, on June 1, 2004, DFA's Jennifer Harr (DFA's Director of Dairy Risk Management) reported that DFA had "decided to continue to defend [the Cheese Spot price at] $1.80 and buy as many as it takes to do so."

35.    As it expected, DFA later sold the cheese that it purchased on the CME outside of the CME at a substantial loss.

**CME Market for June, July and August 2004 Class III Milk Futures Are Relevant Markets**

36.    Class III fluid milk is used to produce all cheeses (other than cottage cheese), including but not limited to hard and soft cheeses, cream cheese, stirred cheese curd, and creamy cheese bases or mixes.

37.    The Milk Futures market trades daily in open outcry and through electronic trades. The Milk Futures expire in each month, with each Milk Future having an expiry for a given month-end. For example, the Milk Futures market will trade Milk Futures that will expire end of January, February, March, etc. Trading in a particular Milk Future on the CME ceases the business day that immediately precedes the day on which the United States Department of Agriculture ("USDA") announces the Class III milk price for that contract month.

38.    Trading for different Milk Futures occur simultaneously with Milk Futures for other months, thus on any given trading day, trades can be made in respect of, say, a January Milk Future (expiring in January) and, say, a September Milk Future (expiring in September). The specific month of the Milk Future that a buyer and seller trade is dependent on the trading parties' hedging (and speculative) needs, and market expectations, as the traders believe they will be at that particular month-end. For example, if a trader believes that his inventory requires that he buy a January Milk Future, he will purchase a January Milk Future, and not a February Milk Future. Indeed, it may be that the trader's internal inventory requirements require that he

10

buy a January Milk Future, but on the same trading day, the trader's internal inventory requirements also require him to sell a February Milk Future.

39.     Additionally, as one month's Milk Futures are traded autonomously of another month's Milk Futures, based upon trading parties' hedging needs and expectations in respect of that particular month-end (i.e., expectations of market conditions from the end of January may well differ from market expectations for the end of February), one month's Milk Future is not substitutable for another month's Milk Future.

40.     Thus, Milk Futures contracts in respect of June, July and August 2004 are products with unique attributes and characteristics for which there are no practical substitutes.

41.     The CME governs trading in the Milk Futures market through CME Rule Chapter 52, and where an issue is not covered specifically in Chapter 52, by the general rules of the CME. Chapter 52 specifies the futures, and sets out limits on the positions that may be speculatively held by any participant. The Chapter also sets out settlement procedures. Additionally the CFTC regulates the market, and the CME is authorized to provide trading in futures according to an authority granted by the CFTC.

42.     In particular, the CME standardizes Milk Futures contract terms.  Chapter 52 specifies that each Milk Futures contract shall be valued at 2,000 times the USDA Class III Price for milk, traded in 200,000 pound units, and at a price no more than $0.75 per cwt. above or below the previous day's settlement price.   Chapter 52 further provides that all Milk Futures contracts open as of the termination of trading shall be cash settled based upon the USDA Class III price for milk for the particular month, as first released.

43.     Chapter 52 also limits speculative positions directly or indirectly owned, or controlled, by any one person.  At the relevant time, that limit was 1,500 contracts.  Parties

engaged in bona fide hedging positions were exempt from this limit.

44.     The regulatory framework serves to preserve the integrity of the market by prohibiting manipulation in order to provide efficient and correct pricing information to market participants and the economy as a whole.  The regulatory framework also provides confidence to market participants that they are able to hedge risk, according to their economic requirements.

45.     The CME has created a uniquely efficient market for the trading of futures contracts for Class III Milk.  Because of its unique attributes, traders on the exchange, including participants in the dairy industry, do not have any reasonably available alternatives to the Milk Futures market to conduct the transactions for which they use that market.

**Manipulation of the June, July and August 2004 Class III Milk Futures Markets**

46.     In early 2004 defendants commenced a scheme of buying a large number of long Milk Futures contracts.  By May 21, 2004, defendants' combined speculative positions exceeded the CME position limits on the number of Milk Futures contracts that any one entity may control for speculative purposes for the three contract months June, July, and August 2004. The Milk Futures were "held in all DFA's accounts, including those of its subsidiaries, ... total[ing] in excess of 15,000 ... including 6,172 June contracts, 4,656 July contracts and 4,227 August contracts." Order at 3.

47.     On May 21, 2004, defendants controlled one hundred percent of the long positions in Milk Futures contracts of the open interest for the three contract months – June, July, August 2004.

48.     Defendants' purchases on the Milk Futures market increased the prices of Milk Futures.   Defendants compounded this effect through its manipulation of the Cheese Spot

market – the prices of which directly influence the price of Milk Futures. An increase in Spot Cheese prices would also increase the Milk Futures prices.

49.     Defendants' Milk Futures purchases were not for bona fide supply and demand reasons, nor were they for bona fide hedging purposes – they were purely manipulative and uncovered contracts.  This manipulation divested the price on the Cheese Spot market and Milk Futures contracts from the legitimate forces of market supply and demand, and led to defendants controlling prices on both markets.

**The Agreement Between DFA and Keller's**

50.     In furtherance of their conspiracy, defendants routinely communicated with each other through Gary Hanman (DFA), Gerald Bos (DFA), John Wilson (DFA), Frank Otis (Keller's) and Glenn Millar (Keller's) concerning trading strategy and trading decisions which defendants needed to maintain to maximize their profits.

51.     For example, on May 21, 2004, Otis spoke to DFA (Hanman and Bos) requesting that DFA purchase large amounts of Cheese Spot contracts and suggested DFA should purchase them at $1.80 per pound.  DFA followed this exact strategy.

**A Known and Intended Effect of Defendants' Scheme Was to Increase the Price of Dairy Products**

52.     Defendants knew that DFA's contracts for the sale of Dairy Products with many of their customers were based on, *inter alia*, the Cheddar Spot price and the Milk Futures contact price, independent of prices set by any government agency.  The contracts under which DFA sells Borden's American Cheese and Helluva Goods sharp cheddar (both of which plaintiffs purchased) to its customers set the price by reference to the Cheddar Spot price.  Thus, defendants knew that an increase in either of the Cheddar Spot or Milk Futures prices would raise the contract prices with DFA's customers and also increase the value of its inventories.

53.     Defendants also knew that since 1999 or earlier "the Chicago Mercantile Exchange (CME) ... spot cheese market ... impacts the prices of virtually all cheese traded in the United States as well as producer milk prices and milk futures contracts. ... Cheese producers generally use CME spot cheese market prices to set their sales prices, according to industry participants. In turn, minimum prices for raw farm milk bought by many cheese manufacturers are set using a U.S. Department of Agriculture (USDA) pricing formula whose most significant commodity component is the weekly average of cheddar cheese prices drawn from a survey of large cheese manufacturing plants. Futures contracts for milk used in manufacturing cheese are also settled at expiration using the minimum price for milk as determined by the pricing formula." *Spot Cheese Market: Market Oversight Has Increased, But Concerns Remain about Potential Manipulation* ("GAO Report") at 5 (June 2007). Available at http://www.gao.gov/new.items/d07707.pdf.

54.     Cheese Spot prices are also used as a component for the pricing of Class I Milk by, *inter alia*, the USDA and State of California. Class I Milk is fluid milk that is of sufficient quality to be processed into beverages. Private industry participants throughout the nation use the prices set by the USDA and State of California for Class I Milk as the mechanism for pricing in their contracts for the sale/purchase of Class I Milk and products containing Class I Milk. An increase in Spot Cheese prices would therefore have the effect of increasing the price of Class I Milk and products containing Class I Milk.

55.     Thus, defendants knew that manipulation of the Cheese Spot and Milk Futures markets would cause an artificial increase in the prices on those markets that would have the effect of increasing the prices of Dairy Products that DFA sold to its customers.

14

56.     Thus, manipulation of the Cheese Spot market or the Milk Futures market caused an artificial increase in the prices of Dairy Products including, but not limited to, Class I and III Milk prices set by the USDA and the California Department of Food and Agriculture, throughout the United States.

57.     In a presentation at the Dairylea Cooperative Annual Meeting on October 12, 2004, Gary Hanman boasted that the market manipulation "put $1.3 billion in the dairy farmers' pockets, and to the DFA members that was $278 million."

INJURY

58.     Food distributors and retailers of Dairy Products such as supermarkets and convenience and grocery stores – are in a fiercely competitive industry.  They operate on slim margins.  They have the ability to change prices frequently and cheaply.  They cannot afford to absorb price increases and remain profitable.  As a result, they typically pass on entire price increases to their customers such as plaintiffs and the Class.

59.     As a direct and foreseeable consequence of defendants' illegal behavior, plaintiffs and the Class members have been injured in their property in a manner that the federal and state antitrust and unfair trade practices laws were designed to protect.  They have been required to pay more for Dairy Products than they would have in the absence of the wrongful conduct.  Defendants' wrongful conduct has resulted in artificially inflated prices for Dairy Products in each and every state in the continental United States and District of Columbia.

AFFIRMATIVE CONCEALMENT

60.     Defendants made false public statements about the nature of their trading activities in furtherance of the conspiracy.  For example, in a December 30, 2004 article, the

*Chicago Tribune* reported that it was advised by the DFA that its trading activities on Cheese Spot market were "proprietary."

61.    There was nothing "proprietary" about the DFA's trading activities. They were simply a naked manipulation of the Cheese Spot market through purchasing all available cheese on that market.

62.    Mr. Hanman made other public comments stating that DFA purchased the cheese on the Cheese Spot market from May 21, 2004 through June 22, 2004 for its customers and ceased those purchases when it satisfied its customers' demand.

63.    Plaintiffs did not, and could not, discover through reasonable diligence the conspiracy and market manipulation scheme until the CFTC publicly announced its findings on December 16, 2008.

## CLASS ACTION ALLEGATIONS

64.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated. The "Class" is defined as:

> All persons or other legal entities (excluding defendants, their officers, directors, subsidiaries or affiliates), who purchased milk, cheese or other dairy products, indirectly for themselves and not for resale in Arizona, Arkansas, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin between April 1, 2004 and December 16, 2006.

65.    The members of the Class are so numerous that joinder of all of them would be impracticable. The exact number of Class members is unknown by plaintiffs at this time, but plaintiffs believe them to number in the millions.

66.    Plaintiffs' claims are typical of the Class members. Plaintiffs and all Class members were impacted and damaged in the same manner by defendants' wrongful conduct.

Plaintiffs and the Class members purchased Dairy Products at artificially inflated prices because of defendants' wrongful conduct.

67.     Plaintiffs will fairly and adequately protect the interest of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.  Plaintiffs also have retained counsel who have experience in the litigation of complex antitrust class actions including of the type of claims alleged herein.

68.     Questions of law and fact common to the Class members predominate over questions that may affect only individual Class members.  Defendants have acted on grounds generally applicable to the entire Class.  Common questions of law and fact include, but are not limited to:

a.  Whether defendants conspired to fix, raise, maintain or stabilize prices on the Cheese Spot and Milk Futures markets;

b.  Whether the Cheese Spot and Milk Futures markets are relevant markets;

c.  Whether DFA acquired market power in the Cheese Spot and Milk Futures markets;

d.  Whether defendants' conduct violated § 1 of the Sherman Act;

e.  Whether DFA's conduct violated § 2 of the Sherman Act;

f.  When defendants took affirmative steps to conceal their illegal behavior;

g.  Whether defendants' conduct caused the prices that plaintiffs and the Class paid for Dairy Products to be higher than they would have been in the absence of the wrongful conduct;

h.  Whether defendants' conduct violated the state statutes alleged in Count Four;

i.  Whether defendants were unjustly enriched by plaintiffs and the Class and should

be required to disgorge the benefits conferred on it as alleged in Count Five;

j.   Whether plaintiffs and the Class are entitled to equitable and injunctive relief and the nature of such relief.

69.    Class action treatment is superior to any other method for the fair and efficient adjudication of this controversy.  Class action treatment will permit, among other things, (1) millions of similarly situated persons to prosecute their claims in a single forum avoiding the duplication that individual actions would require and (2) adjudication of the Class' relatively small claims which would otherwise go unaddressed because the expense of prosecuting them would greatly outweigh the potential recovery in any individual action.

70.    There are no difficulties that will be encountered in maintenance of this action that would otherwise preclude its treatment as a class action.

## COUNT ONE

### (*PER SE* VIOLATIONS OF § 1 OF THE SHERMAN ACT

### (FOR INJUNCTIVE RELIEF ONLY)

71.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

72.    Defendants entered into contracts, combinations and agreements in unreasonable restraint of trade.

73.    These contracts, combinations and agreements constitute *per se* violations of § 1 of the Sherman Act (15 U.S.C. § 1).

74.    Plaintiffs have no adequate remedy at law and are threatened with harm to their property by reason of defendants' violations of the Sherman Act.  Accordingly, plaintiffs are entitled to injunctive and equitable relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

COUNT TWO

(QUICK LOOK/RULE OF REASON VIOLATIONS OF § 1 OF THE SHERMAN ACT)

(FOR INJUNCTIVE RELIEF ONLY)

75.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

76.     The Cheese Spot market and the Milk Futures market for June, July and August 2004 contracts are relevant markets.

77.     The anticompetitive effects of the agreements into which defendants entered herein outweighed any purported procompetitve benefits in the relevant markets or in any market.

78.     These agreements caused prices in the relevant markets to rise and the amount of contracts sold in the relevant markets to decrease.  It also caused the prices of Dairy Products to rise and production and the amount of Dairy Products purchased to decrease.

79.     By reason of the foregoing, defendants have violated § 1 of the Sherman Act.

COUNT THREE

(MONOPOLIZATION IN VIOLATION OF § 2 OF THE SHERMAN ACT)

(AGAINST DFA ONLY)

(FOR INJUNCTIVE RELIEF ONLY)

80.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

81.     DFA wrongfully acquired monopoly power in the relevant markets.

82.     DFA's monopolization of the relevant markets caused prices in the relevant markets to rise and the amount of cheese and Milk Futures contacts sold in the relevant markets

to decrease. It also caused the prices for Dairy Products to rise and production and the amount of Dairy Products purchased to decrease.

83. By reason of the foregoing, DFA violated § 2 of the Sherman Act.

84. Plaintiffs have no adequate remedy at law and are threatened with harm to their property by reason of DFA's violations of the Sherman Act. Accordingly, plaintiffs are entitled to injunctive and equitable relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

COUNT FOUR

(STATE STATUTES)

85. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86. Defendants' wrongful conduct violates the statutes in the following states and District of Columbia:

a. Arizona (Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. §§ 44-1402 & 1403);

b. Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107(a)(10));

c. California (Cartwright Act, Cal. Bus. & Prof. Code §§ 16722 & 16726);

d. District of Columbia (Antitrust Act, D.C. Code Ann. §§ 28-4502 & 28-4503);

e. Florida (Deceptive & Unlawful Trade Practices Act, Fla. Stat. § 501.204);

f. Iowa (Competition Law, §§ 553.4 & 553.5);

g. Kansas (Restraint of Trade Act, Kan. Stat. Ann. § 50-112);

h. Maine (ME Rev. Stat. Ann., Tit. 10, §§ 1101 & 1102);

i. Massachusetts (Mass. Gen. Laws Ann. Ch. 93a, § 2);

j. Michigan (Antitrust Reform Act, Sections 2, Mich. Comp. Laws Ann. §§ 445.772 & 445.773);

    k.  Minnesota (Antitrust Law, Minn. Stat. §§ 325D.51 & 325D.52);

    l.  Mississippi (Miss. Code Ann. §§ 75-21-1 & 75-21-3);

    m.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-103 & 30-14-205);

    n.  Nebraska (Junkin Act, Neb. Rev. Stat. §§ 59-801 & 59-802);

    o.  Nebraska (Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602, 59-1603 & 59-1604);

    p.  Nevada (Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.06);

    q.  New Hampshire (N.H. Rev. Stat. Ann. § 358-A:2);

    r.  New Mexico (Antitrust Reform Act, N.M. Stat. Ann. §§ 57-1-1 & 57-1-2);

    s.  New York (Donnelly Act, N.Y. Gen. Bus. Law § 340(1));

    t.  North Carolina (N.C. Gen. Stat. §§ 75-1 & 75-2.1);

    u.  North Dakota  (Uniform State Antitrust Act, N.D. Cent. Code, §§ 51.08.1-02 & 51.08.1-03);

    v.  South Dakota (Antitrust Law, S.D. Codified Laws Ann. §§ 37-1-3.1 & 37-1-3.2);

    w.  Tennessee (Trade Practices Act, Tenn. Code Ann. § 47-25-102);

    x.  Vermont (Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2453);

    y.  West Virginia (Antitrust Act, W.Va. Code §§ 47-18-3 & 47-18-4);

    z.  Wisconsin (Antitrust Act, Wis. Stat. Ann. § 133.03).

87.    Defendants' conduct was a willful, deliberate, malicious and flagrant violation of the foregoing state antitrust and unfair trade practices laws.

## COUNT FIVE

### (UNJUST ENRICHMENT)

88.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89.     Plaintiffs seek to recover for unjust enrichment based on the laws of Arizona, Arkansas, California, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin and the District of Columbia.

90.     They rely exclusively on the states statutes set forth in Count Four above as the basis to determine defendants' liability.

91.     Through paying more for Dairy Products than they would have in the absence of defendants' wrongful conduct, plaintiffs and the Class have conferred a benefit on the defendants.

92.     As a result of defendants' wrongful conduct, defendants were able to charge more for Dairy Products. Plaintiffs and the Class made these payments to retailers of Dairy Products, but defendants were ultimately the sole beneficiaries of the overpayments.

93.     Plaintiffs have no remedy available to them against the persons or entities from whom they purchased Dairy Products. The absence of any remedy renders any attempt to exhaust their remedies futile.

94.     Plaintiffs and the Class have no adequate remedy at law, and will not be made whole for the harm defendants caused them absent recovery of the benefits that they unjustly conferred on defendants.

95.     Defendants have been unjustly enriched by overpayments made by plaintiffs and the Class.  Equity demands that defendants be required to make restitution, disgorge the profits they made from plaintiffs and the Class, and return the overpayments to plaintiffs and the Class.

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that the Court enter judgment as follows:

a.      Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b.      Enjoining defendants from manipulating any market on the CME and ordering such other relief to remediate the market and contractual conditions that would render such wrongful behavior profitable in the future;

c.      Awarding plaintiffs and the relevant Class members compensatory damages under the state statutes in an amount to be proven at trial, trebled according to law against defendants, jointly and severally;

d.      Awarding plaintiffs and the relevant Class members punitive, exemplary, statutory, and full consideration damages under the state laws that permit such recoveries;

e.      Ordering defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to plaintiffs and the Class;

f.      Awarding plaintiffs and the Class pre-judgment and post-judgment interest;

g.      Awarding plaintiffs and the Class their costs of suit, including reasonable attorneys' fees; and

h.      Granting plaintiffs and the Class such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, plaintiffs and the Class demand

a trial by jury on all claims alleged herein that are so triable.

Dated: September 12, 2011

Matthew S. Wild
WILD LAW GROUP PLLC
121 Reynolda Village, Suite M
Winston-Salem, NC  27106
Tel. (855) 945-3529
mwild@wildlawgroup.com

John M. Perrin
WILD LAW GROUP PLLC
27735 Jefferson Drive
St. Clair Shores, MI  48081
Tel. (855) 945-3529
jperrin@wildlawgroup.com

Attorneys for Plaintiffs